UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11081-RWZ

PALOMAR MEDICAL TECHNOLOGIES, INC.,
and THE GENERAL HOSPITAL CORPORATION

v.

TRIA BEAUTY, INC.

ORDER

February 15, 2012

ZOBEL, D.J.

Plaintiffs Palomar Medical Technologies, Inc. ("Palomar"), and The General Hospital Corporation bring this action for patent infringement against defendant TRIA Beauty, Inc. ("TRIA"). They claim that TRIA's Laser Hair Removal System infringes on two of their patents entitled "Permanent Hair Removal Using Optical Pulses" ("the '568 patent") and "Hair Removal Using Optical Pulses" ("the '844 patent") (collectively, "patents-in-suit"), issued in 1997 and 1998, respectively. TRIA counterclaims that among other things plaintiffs' alleged withholding of material references and prior art from the U.S. Patent and Trademark Office during the prosecution of the patents-in-suit renders them invalid and/or unenforceable.

TRIA disclosed Dr. Kenneth Arndt as an expert on infringement and invalidity[1] and notified plaintiffs that it intended to disclose "confidential" or "highly confidential"

---

[1] TRIA describes the issues Dr. Arndt addresses in his expert reports as "whether TRIA's device infringes the asserted claims of the patents-in-suit and whether those claims are invalid. . . . As to invalidity, Dr. Arndt opines on whether the asserted claims are anticipated by, or obvious in light of, the prior art as of the relevant date, which is approximately the 1994-1995 timeframe." Docket # 82 at 2.

information to him pursuant to the protective order which I entered on November 25, 2009. Plaintiffs now move to disqualify Dr. Arndt and to deny him access to their confidential information on the grounds that he has a conflict of interest. Docket ## 65, 69. Disposition of this and other outstanding motions[2] follows.

## I. Background

Plaintiffs' argument relies on a consulting relationship between Dr. Arndt and Palomar which expired almost a decade ago,[3] and a 1994 relationship between him and Star Medical Technologies, Inc. ("Star Medical"), a former Palomar subsidiary.

### A. 2002 Consulting Agreement

On May 2, 2002, Dr. Arndt signed a "Consulting Agreement" with Palomar to "provide consultation . . . with respect to the safety and efficacy of the EsteLux Pulsed-Light System" ("EsteLux System"). Docket # 71 Ex. C at Sch. 1. The EsteLux System uses Intense Pulsed Light ("IPL") to perform a variety of cosmetic and aesthetic procedures, including hair removal, and involves various "hand-pieces" which are each capable of performing different tasks.

The agreement provided that Dr. Arndt was to conduct two clinical studies "per protocol provided by Palomar": "The first of two to commence on May 1, 2002 to evaluate the safety and efficacy of the LuxG hand-piece for treatment facial vascular

---

[2] See Docket ## 68, 84, 85, 90, 92.
[3] The record does not support plaintiffs' claim that Dr. Arndt's consulting relationship with Palomar remains ongoing. Dr. Arndt's disclosure form and declaration rebut the statement on the American Society for Dermatologic Surgery web site on which plaintiffs rely. Docket # 82 Ex. 3 ¶ 9. His participation in a 2010 Palomar-sponsored roundtable discussion—for which he received an honorarium—is not evidence of a continued consulting relationship. Additionally, at the end of Palomar's article recounting the discussion, several of the other participating doctors disclosed a consulting relationship with, or research support from, Palomar; Dr. Arndt reported "no relevant disclosures." Docket # 71 Ex. T.

and pigmented lesions and skin rejuvenation ...[,]" and the second for "[e]valuation of newly developed hand-pieces and the EsteLux II System (specific details TBD)." Id. He was to provide Palomar with a written report at the end of the studies. The agreement contained a confidentiality provision[4] and was to run from May 1, 2002 to April 30, 2003, "unless earlier terminated under the terms of [the agreement]." Docket # 71 Ex. C at 1.

Palomar sent Dr. Arndt two hand-pieces: the LuxG and the LuxY. The LuxG is used for skin rejuvenation and to treat pigmented and vascular lesions; the LuxY is specifically designed to perform hair removal but can also treat pigmented lesions. Palomar files indicate that Dr. Arndt conducted a clinical study of the LuxG for use in skin rejuvenation, but that he did not prepare a final report of this study. The record does not reflect (and plaintiffs do not assert) that he ever used the LuxY.

On June 11, 2002, Dr. Arndt attended a meeting with Dr. Gregory Altshuler, Palomar's Senior Vice President of Research, Dr. Michael Smotrich, Chief Technology Officer, and Michail Pankratov, then Vice President of Clinicals and Consumer Relations. Dr. Altshuler gave a PowerPoint presentation entitled "New Clinical Studies

---

[4] The provision read, in relevant part: "In order to assist Consultant in the performance of this Agreement, Company may provide Consultant with confidential information including, but not limited to, trade secrets, ideas, data, business plans, drawing, concepts, creative works, inventions, and compilations of information which are owned or licensed by the Company (hereafter "Confidential Information").

"Consultant shall use a reasonable degree of care . . . to protect and prevent unauthorized disclosure of any Confidential Information . . . unless such information (a) was known to Consultant prior to receipt of the information directly or indirectly from Company; (b) is now or becomes known to Consultant through no act or failure to act on the part of Consultant or of any person under any obligation of confidentiality to Company; or (c) is now or becomes generally known or available to the public. Consultant shall use Confidential Information only in the performance of this Agreement. No other use of Confidential Information, whether for Consultant's benefit or for the benefit of others, shall be permitted. In no event is Consultant authorized to disclose Confidential Information without the prior written approval of Company." Docket # 71 Ex. C ¶ 6.

with EsteLux," where he discussed the safety and efficacy of using IPL for hair removal, skin rejuvenation, and the treatment of vascular and pigmented lesions. He also presented information about Palomar's plans to develop an over-the-counter, light-based hair removal product; its design and development of products for light-based hair removal; two technologies related to light-based hair removal which were then patent-pending; and other Palomar products and research including new treatment methods for collagen remodeling, and potential future studies on wrinkle treatment. Docket # 71 Ex. I ¶¶ 8-15.

In September 2002, Dr. Arndt billed Palomar for "monthly services rendered" between May 2002 and July 2002. Handwritten notes on the bill indicate that Dr. Arndt "(1) Treated several patients,"[5] and "(2) Provided advice on protocol development for treatment facial telagiectasia; pigmented lesions; leg veins; skin rejuvenation." Docket # 71 Ex. N.

### B. 1994 Star Medical Relationship

In or about August 1994, Star Medical, then a subsidiary of Palomar,[6] sent Dr. Arndt, who was then practicing at Beth Israel Hospital, a high pulse energy diode array laser. In a letter to Palomar executives, Star Medical expressed hope that Dr. Arndt and researchers at two other facilities each equipped with the laser would examine its applications in tissue welding and treatment of dermatologic lesions, and uncover its potential for other medical applications. Docket # 80 Ex. B. The additional relevant

---

[5] Since he conducted some clinical trials of the Lux G hand-piece, which was used for treatment of pigmented lesions, vascular lesions, and skin rejuvenation, I infer that the "treatment" for which he billed Palomar was related to these conditions and not to hair removal.

[6] Palomar sold Star Medical to Coherent in April 1999. On the date of sale, Palomar owned 82.46% of Star Medical. Docket # 79 Ex. A (Palomar 1999 Form 10-K).

4

record consists of an undated PowerPoint presentation discussing, among other things, the status of "hair growth inhibition" research at Star Medical. One slide notes the presence of a "high pulse energy unit at Beth Israel Hospital," followed by the date "March 1995" and a bullet noting "Ken Arndt will conduct experiments." Docket # 80 Ex. C at 13.

## II. Analysis

"Although courts are generally reluctant to disqualify expert witnesses, federal courts have inherent authority to disqualify experts 'if necessary to preserve public confidence in the fairness and integrity of the judicial system.'" Lacroix v. Bic Corporation, 339 F.Supp.2d 196, 199 (D.Mass. 2004)(quoting Koch Refining Co. v. Jennifer L. Boudreaux, M/V, 85 F.3d 1178, 1181 (5th Cir. 1996))(internal citation omitted). To prevail on their motion to disqualify, plaintiffs—as the moving party—must prove both that (1) it was objectively reasonable for them to believe that Palomar had a confidential relationship with Dr. Arndt; and (2) that Palomar disclosed confidential information to Dr. Arndt that is relevant to the current litigation. Lacroix, 339 F.Supp.2d at 199-200. In determining whether disqualification is appropriate, I may also consider the court's interest in "preventing conflicts of interest and maintaining judicial integrity" and the public interest in permitting experts to "pursue their trade" and parties "to select their own experts." Chamberlain Group v. Interlogix, Inc., No. 01 C 6157, 2002 WL 653893, at *4 (N.D. Ill. Apr. 19, 2002).

### A. Confidential Relationship

The 2002 consulting agreement contained a provision which defined "confidential information" to include "trade secrets, ideas, data, business plans, drawing, concepts, creative works, inventions, and compilations of information which are owned or licensed by the Company." Docket # 71 Ex. C ¶ 6. In their declarations, Dr. Altshuler and Michail Pankratov discuss meetings with Dr. Arndt where Palomar explained its research plans and future products, which could be considered "confidential information" under the agreement. Docket # 71 Exs. I, O. By signing the agreement, Dr. Arndt committed to using "a reasonable degree of care . . . to protect and prevent unauthorized disclosure" of confidential information and to only use such information "in the performance of this Agreement." Docket # 71 Ex. C ¶ 6. Under these circumstances, plaintiffs have shown that it was objectively reasonable for them to believe that Palomar had a confidential relationship with Dr. Arndt under the 2002-2003 consulting agreement. See Hewlett-Packard Co. v. EMC Corp., 330 F.Supp.2d 1087, 1093 (N.D. Cal. 2004)(in evaluating the reasonableness of the party's belief that relationship was confidential, court may consider many factors including "whether the parties entered into a formal confidentiality agreement").

The converse is true of Dr. Arndt's 1994 relationship with Star Medical. There is no objective evidence that Star Medical treated the relationship as confidential. See Mayer v. Dell, 139 F.R.D. 1, 3 (D.D.C. 1991)(no expectation of confidentiality where plaintiff's counsel never proffered a confidentiality agreement, followed up with expert to confirm an understanding regarding confidentiality, or made any request of confidentiality in contemporaneous notes). Plaintiffs claim that the diode laser was an

6

early prototype device, and that "Dr. Arndt's use of this prototype offered him confidential information related to how the diode laser prototype worked and how it was altered before it was submitted by Palomar for FDA clearance and brought to market as Light Sheer." Docket # 79 Ex. 1. While the sparse record could permit the inference that Dr. Arndt used the diode laser, there is no evidence that Star Medical offered Dr. Ardnt confidential information about the laser or how it was "altered." Nor do several bullet points in a PowerPoint slide, without more, merit the inference that Dr. Arndt conducted confidential experiments or clinical studies for Star Medical, much less experiments related to Palomar's licensing of the patents-in-suit, as plaintiffs claim. Plaintiffs offer no facts to support the inference that Star Medical – Palomar's subsidiary – let alone Palomar itself, reasonably believed the 1994 relationship with Dr. Arndt was confidential, or that "the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate." Lacroix, 339 F.Supp.2d at 200 (quoting Paul v. Rawlings Sporting Goods Co., 123 F.R.D. 271, 278 (S.D. Ohio 1988)).

### B. Confidential Information Relevant to the Litigation

Even though plaintiffs have demonstrated a reasonable belief that the 2002-2003 consulting relationship was confidential, to prevail they must also show that during that relationship, Palomar disclosed confidential information relevant to this litigation. In the context of expert disqualification,

> [c]onfidential information essentially is information of either particular significance or that which can be readily identified as either attorney work product or within the scope of the attorney-client privilege. Confidential

information may include discussion of one party's strategy in the litigation, the kinds of experts [the party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses.

Twin City Fire Ins. Co., Inc. v. Mitsubishi Motors Credit of America, Inc., No. SACV 04-0043 CAS, 2006 WL 5164249, at * 3 (C.D. Cal. Nov. 6, 2006)(internal quotation marks and citations omitted). It is undisputed that none of the information disclosed to Dr. Arndt constituted litigation strategy or attorney work product, or otherwise fell within the attorney-client privilege. This weighs strongly against disqualification. See Stencel v. Fairchild Corp., 174 F.Supp.2d 1080, 1083 (C.D. Cal. 2001)("Courts are more likely to find for the moving party if any of the following information is shared: legal strategies, the types of experts to be called, the attorney's views on the relative strengths or merits of a claim or defense, the role of other witnesses at trial or anticipated defenses.")(citing Koch Refining, 85 F.3d at 1181).

Furthermore, plaintiffs have not shown that Dr. Arndt received information of particular significance relevant to this litigation. The LuxG - with which Dr. Arndt conducted clinical studies - is not used for hair removal. There is no evidence that he ever used the LuxY - the EsteLux hand-piece designed for hair removal - much less conducted clinical studies or evaluated its safety or efficacy. While the consulting agreement says that Dr. Arndt was to conduct a clinical study evaluating "newly developed hand-pieces and the EsteLux II system (specific details TBD)," there is no evidence that any such "details" were ever developed or that such evaluations took place. Thus, whatever Dr. Arndt may have learned in evaluating Palomar's EsteLux

8

System is irrelevant to whether TRIA's Laser Hair Removal System infringes on the patents-in-suit, and certainly would not constitute "substantive information about the case." City of Springfield v. Rexnord Corp., 111 F.Supp.2d 71, 75 (D.Mass. 2000).

Similarly, information Dr. Arndt may have learned in meetings with Dr. Altshuler and other Palomar executives about Palomar's research plans and products is irrelevant. Moreover, whatever Dr. Arndt may have learned about the state of Palomar's research in 2002 has no bearing on whether the prior art at the time the patents-in-suit were prosecuted in the 1990s renders them invalid or unenforceable.

### III. Conclusion

Plaintiffs' motion to disqualify Dr. Arndt and deny him access to plaintiffs' confidential information under the protective order (Docket ## 65,69) is DENIED. Plaintiffs' motion for extension of time to complete certain expert discovery (Docket # 68) is ALLOWED. On or before February 29, 2012, the parties shall submit a proposal with dates for the completion of expert discovery. The parties' motions to seal certain portions of their filings (Docket ## 84, 88, 90, 92) and TRIA's motion for leave to file supplemental materials (Docket # 85) are ALLOWED. Plaintiffs' motion to seal their motion to deny Dr. Mark Weckwerth access to their confidential information (Docket # 92) is DENIED AS MOOT because plaintiffs have withdrawn the underlying motion.

|  |  |
|---|---|
| February 15, 2012 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |

9